IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

**KEY INVESTMENT GROUP LLC,**

**TOTALTICKETS.COM LLC,**

**TOTALLY TIX LLC,**

**FRONT ROSE TIX LLC,**

**WLK INVESTMENTS LLC,**

**YAIR D. ROZMARYN**, individually and as an officer and manager of Key Investment Group LLC, as a member and manager of Front Rose Tix, LLC, and as a manager of TotalTickets.com LLC and Totally Tix LLC,

**ELAN N. ROZMARYN**, individually and as an officer and manager of Key Investment Group LLC, as a member and manager of Front Rose Tix, LLC, and as a manager of TotalTickets.com LLC and Totally Tix LLC,

and,

**TAYLOR KURTH**, individually and as an officer and de facto manager of Key Investment Group LLC, and as a de facto manager of WLK Investments LLC,

       Plaintiffs,

    v.

**ANDREW N. FERGUSON**
in his official capacity as Chairman of the Federal Trade Commission,

**MELISSA ANN HOLYOAK,**
in her official capacity as a Commissioner of the Federal Trade Commission,

**Civil Action No.**

**MARK R. MEADOR,**
in his official capacity as a Commissioner of
the Federal Trade Commission,

**REBECCA K. SLAUGHTER,**
in her official capacity as a Commissioner of
the Federal Trade Commission,

and

the **FEDERAL TRADE COMMISSION**,

     Defendants.

## COMPLAINT

1. The Better Online Ticket Sales Act ("BOTS Act"), codified at 15 U.S.C § 45c, was enacted and designed to prevent bad actors from using computer scripts or computer code (software colloquially known as "bots") from

> circumvent[ing] a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules

15 U.S.C § 45c(a)(1)(A).

2. Plaintiffs do not use bots.

3. Plaintiffs do not "circumvent a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules."

4. The online service relevant to this action is Ticketmaster. Ticketmaster does not "enforce posted event ticket purchasing limits or [] maintain the integrity of posted online ticket purchasing order rules" in relation to Plaintiffs.

1

5.     Despite these facts, Defendants have informed Plaintiffs that they will imminently be filing a lawsuit against Plaintiffs for alleged violations of the BOTS Act.

6.     Defendants have informed Plaintiffs that they intend to use the BOTS Act to shut down Plaintiffs' legitimate business.

7.     Defendants have also informed Plaintiffs that Plaintiffs knew or should have known—and have known or should have known since 2016, when the BOTS Act was enacted—that they violate the BOTS Act.

8.     Thus, Defendants have further informed Plaintiffs that they will be seeking civil penalties in the tens of millions of dollars pursuant to Section 5 of the FTC Act, 15 U.S.C. § 45(m)(1)(A) (which provision requires actual knowledge or knowledge fairly implied for civil penalties to accrue).

9.     Plaintiffs do not violate the BOTS Act.

10.    Plaintiffs purchase tickets on the primary ticket market and resell those tickets on the secondary-ticket market. In doing so, Plaintiffs' behavior mirrors the behavior of the entire legitimate secondary-ticket market (*i.e.*, those businesses who do not use bots to purchase tickets).

11.    In order for their business model to make sense, Plaintiffs—and the rest of the legitimate secondary-ticket market—use multiple accounts to secure tickets. Many other companies, businesses, and individuals also use multiple accounts to secure tickets.

12.    Defendants' position is that any individual or company who uses more than one account to purchase tickets from a primary ticket seller, such as Ticketmaster, violates the BOTS Act.

13.    Defendants' position is that by using multiple accounts, individuals and companies, including businesses such as Plaintiffs', "circumvent a security measure, access control system, or other technological control or measure."

14.    Defendants' position is that this is true whether or not the primary ticket seller (in this case, Ticketmaster) "enforce[s] posted event ticket purchasing limits or [] maintain[s] the integrity of posted online ticket purchasing order rules."

15.    Defendants' desire to expand the BOTS Act to implicate Plaintiffs, the rest of the secondary-ticket market, and an unknown number of companies and individuals who use multiple accounts to purchase tickets, runs counter to the BOTS Act's statutory text, its legislative history, prior FTC enforcement action of the BOTS Act, prior FTC guidance, and Congress's and the general public's understanding of what the BOTS Act is and was meant to do.

16.    Defendants have made it clear to Plaintiffs that they intend to use the BOTS Act to shut down the entire secondary-ticket market, with Plaintiffs being the first in a long line of dominoes Defendants hope to tumble.

17.    If Defendants' reinterpretation of the BOTS Act were successful, it would provide a very few multinational conglomerates who sell tickets on the primary market an effective monopoly.

18.    The Federal Trade Commission ("FTC") is meant to break up monopolies, not to create them. *See*, *e.g.*, 15 U.S.C. § 2.

19.    The FTC is meant to protect consumers, not to destroy industries. *See*, *e.g.*, 15 U.S.C. § 45(a)(2).

20.    The FTC is meant to enforce the BOTS Act, not to rewrite it. *See* 15 U.S.C. § 45c(b)(2)(A).

21.     In attempting to misuse the BOTS Act to destroy Plaintiffs' legitimate business and, by extension, the entirety of the secondary-ticket market, Defendants' actions run counter to both the BOTS Act and the FTC's very purpose.

22.     Plaintiffs are thus compelled to bring this action for Declaratory Judgment, Injunctive Relief, and a finding that Defendants' strained reading of the BOTS Act is unconstitutionally vague as to Plaintiffs and other similarly situated businesses in the secondary-ticket market who do not use bots.

## VENUE AND JURISDICTION

23.     Venue is proper pursuant to 28 U.S.C. §§ 1391(b)(2), (e)(1)(B), and (e)(1)(C), as a substantial portion of the alleged events or omissions giving rise to the claims at issue occurred in this District and one or more Plaintiffs reside in this District.

24.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201, *et seq.*

## THE PARTIES

25.     The Corporate Plaintiffs in this action (Key Investment Group LLC; TotalTickets.com LLC; Totally Tix LLC; Front Rose Tix LLC; and WLK Investments LLC) consist of Key Investment Group, a Pikesville, Maryland-based company, and certain of its subsidiary and controlling entities (collectively, "Key Investment Group" or "KIG"). The Individual Plaintiffs in this action are officers of one or more of those companies (together, the "Individual Plaintiffs").

26.     Plaintiff Key Investment Group, LLC is a professional limited liability company incorporated in Delaware. Its principal place of business is 1777 Reisterstown Road, Suite 363, Pikesville, Baltimore County, Maryland 21208. At all times relevant to this Complaint, Key

Investment Group, LLC purchased tickets without the use of bots, sold tickets without the use of bots, and distributed tickets without the use of bots throughout the United States, including in this District.

27.     Plaintiff TotalTickets.com, LLC is a professional limited liability company incorporated in Florida. Its principal place of business is 2755 East Oakland Park Boulevard, Suite 230, Fort Lauderdale, Florida 33306. TotalTickets.com is a wholly owned subsidiary of KIG. At all times relevant to this Complaint, TotalTickets.com purchased tickets without the use of bots, sold tickets without the use of bots, and distributed tickets without the use of bots throughout the United States, including in this District.

28.     Plaintiff Totally Tix, LLC is a professional limited liability company incorporated in Delaware. Its principal place of business is 1777 Reisterstown Road, Pikesville, Baltimore County, Maryland 21208. Totally Tix is a wholly owned subsidiary of KIG. At all times relevant to this Complaint, Totally Tix purchased tickets without the use of bots, sold tickets without the use of bots, and distributed tickets without the use of bots throughout the United States, including in this District.

29.     Plaintiff Front Rose Tix, LLC is a professional limited liability company incorporated in Maryland. Its principal place of business is 1777 Reisterstown Road, Pikesville, Baltimore County, Maryland 21208. Front Rose Tix is the majority owner and a member of KIG. At all times relevant to this Complaint, Front Rose Tix purchased tickets without the use of bots, sold tickets without the use of bots, and distributed tickets without the use of bots throughout the United States, including in this District.

30.     Plaintiff WLK Investments, LLC, is a professional limited liability company incorporated in Delaware. Its principal place of business is 1777 Reisterstown Road, Suite 363,

Pikesville, Baltimore County, Maryland 21208. WLK Investments is an owner and member of KIG. At all times relevant to this Complaint, WLK Investments, LLC purchased tickets without the use of bots, sold tickets without the use of bots, and distributed tickets without the use of bots throughout the United States, including in this District.

31.    Plaintiff Yair Rozmaryn is the Chief Operating Officer of KIG and manager of KIG.

32.    Plaintiff Elan Rozmaryn is the Chief Financial Officer of KIG.

33.    Plaintiff Taylor Kurch is the Chief Strategy Officer of KIG.

34.    Defendant Andrew N. Ferguson is the Chairman of the Federal Trade Commission.

35.    Defendant Melissa Ann Holyoak is a Commissioner of the Federal Trade Commission.

36.    Defendant Mark R. Meador is a Commissioner of the Federal Trade Commission.

37.    Defendant Rebecca K. Slaughter is a Commissioner of the Federal Trade Commission.

38.    Defendant the Federal Trade Commission is an independent agency of the United States Government created by the FTC Act, 15 U.S.C. §§ 41, *et seq.*

## STATEMENT OF FACTS

### The BOTS Act's History

39.    In the late aughts and early 2010s, enterprising coders created bots designed to circumvent security measures and access control systems in order to bypass "virtual waiting room" lines, go straight to the primary ticket issuer's purchasing page, and purchase hundreds or thousands of tickets before the regular public had a fighting chance to purchase them.

40.     These bots, when implemented, allowed their users to circumvent a primary ticket-sellers security measures, access control systems, or other technological controls or measures by, for example:

(a)     Jumping to the head of a queue in a virtual waiting room to gain immediate access to a ticket-purchasing page,

(b)     Exceeding the maximum purchase limits enforced by the primary ticket broker for a single account, and/or

(c)     Circumventing other technological measures and controls, such as by skipping CAPTCHAs on a ticket purchasing page to purchase tickets more quickly than other consumers.

41.     This misuse of bots by bad actors has caused and continues to cause consumer harm.

42.     Prior to 2016, there was no federal law protecting consumers from the use of these types of bots by bad actors.

43.     In 2016, Congress changed that through the passage of the BOTS Act.

### The BOTS Act's Legislative History

44.     The legislative history of the BOTS Act was not shy that the new legislation was meant to target unscrupulous bot users.

45.     A September 13, 2016 Hearing on the legislation opened with a statement of Senator Jerry Moran. Senator Moran began his remarks by stating that the issue the BOTS Act is meant to deal with is bots:

> When you're trying to pick up tickets for the next big event, you're no longer only competing against other eager fans when the tickets are released. *You are now forced to compete against an army of sophisticated ticket bots that overwhelm the ticketing website through brute force, scoop up as many tickets as possible, and then resell them on a secondary market at a significant markup*.

*Examining the Better Online Ticket Sales Act of 2016: Hearing on S. 3183 Before the U.S. Subcomm. on Consumer Prot., Prod. Safety, Ins., and Data Sec., of the Comm. on Com., Sci., and Transp.,* 114 Cong. 1, 2016 WL 4773371, at 1 (2016) (Statement of Jerry Moran) (emphasis added).

46.    Senator Moran went on to explain that the BOTS Act was ***not*** targeting the legitimate secondary-ticket market that does ***not*** use bots.

> ***I certainly believe that a vibrant secondary ticket marketplace is nothing but good for consumers. People can and should be able to sell their tickets in the marketplace, and if people are willing to pay extra for certain performances, that is their right.*** StubHub estimates that half the tickets sold on their platform are below face value, so the value prospect cuts both ways for consumers.

*Id.* at 2 (emphasis added)

47.    Jeffrey Seller, a producer of *Hamilton* and another individual who gave testimony at the hearing, emphasized that his issue was not with the secondary market, which in "many instances i[s] a useful tool for buyer['s] and seller[s]." *Id.* at 11. Instead, the issue that needed to be solved was the elimination of bot-users:

> Bots are computerized cheaters. The people who employ bots use sophisticated software that cuts the line, paralyzes the system, and holds and purchases every available seat before a consumer has a chance. They remove the notion of a level playing field from the very system that was designed to make it easy for consumers to buy tickets, no matter where they live.

*Id.* at 11.

48.    On December 5, 2016, Senator (now Majority Leader) John Thune issued the BOTS Act's Senate Report. S. Rep. No. 114-391, 2016 WL 7115899 (2016). The Senate Report confirms that the BOTS Act's purpose was to target and eliminate

> scalpers ***who use software to circumvent the safeguards primary ticket sellers use to limit ticket purchases***. This software, commonly referred to as ''bots'' or ''bot'' software, ***automates*** ticket buying on online platforms by: (1) ***automatically and***

> ***continuously checking ticket seller websites for ticket releases***; (2) automatically reserving and displaying available tickets for the human operator; (3) automatically buying tickets using as many names, addresses, and credit card numbers as necessary to appear to be individual ticket buyers; and (4) defeating anti-ticket bot security measures such as so-called CAPTCHA (Completely Automated Public Turing test to tell Computers and Humans Apart) to determine whether or not a ticket purchaser is human.

*Id.* at 1 (emphasis added).

49.    The legislative history of the BOTS Act could not be clearer. The BOTS Act was meant to target bots.

### The BOTS Act's Statutory Text

50.    On December 14, 2016, President Obama signed the BOTS Act into law. Befitting a law meant to rid the scourge of bots, Section 1 of the Act stated, "***This Act may be cited as . . . the 'BOTS Act of 2016***.'" Pub. L. No. 114–274, Sec. 1 (emphasis added). The Act is called the BOTS Act because it is about bots.

51.    Pursuant to the plain language of the statute, if an entity does not "***circumvent a security measure, access control system, or other technological control or measure***," the entity does not violate the BOTS Act. *Id*. at Sec. 2(a)(1)(A) (emphasis added).

52.    In order to violate the BOTS Act, a "security measure," "control system," or "other technological control or measure" must be "used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules." *Id.*

53.    Pursuant to the plain language of the statute, if a primary ticket issuer does not "***enforce posted event ticket purchasing limits***" or "***maintain the[ir] integrity***," the entity purchasing tickets does not violate the BOTS Act. *Id.*

54.     Pursuant to 15 U.S.C. § 45c(b), Congress tasked the FTC with enforcement of the BOTS Act. Congress did not provide the FTC with rulemaking power in relation to the BOTS Act. *See generally* 15 U.S.C. § 45c. As such, the FTC may only enforce the BOTS Act as written.

### Prior Enforcement of the BOTS Act

55.     On April 7, 2017, the FTC put out its first statement on the BOTS Act, in the form of a blog post. *See* Lesley Fair, *BOTS Act: That's the Ticket!*, Fed. Trade Comm. (April 7, 2017), https://www.ftc.gov/business-guidance/blog/2017/04/bots-act-thats-ticket. The post stated, in pertinent part, "It's no coincidence that it's called the BOTS Act because the law outlaws the use of computer software like bots that game the ticket system."

56.     A blog post is, of course, not precedential. A blog post cannot be used to prove actual knowledge or knowledge fairly implied regarding what the BOTS Act means.

57.     But Ms. Fair's blog post, issued just a few months after the BOTS Act was enacted, showcased the contemporaneously uniform position that the BOTS Act was about bots.

58.     As of the date of this filing, the FTC has settled three BOTS Act cases, all in early 2021. None of those cases were litigated. *See FTC Brings First-Ever Cases Under the BOTS Act*, Fed. Trade Comm. (Jan. 22, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/01/ftc-brings-first-ever-cases-under-bots-act.

59.     In each of those three cases, the defendants were recidivist bots users. The FTC emphasized in the three Complaints and in the Press Release accompanying them that the three bot users were implicated by the BOTS Act because they "allegedly used automated software to illegally buy up tens of thousands of tickets for popular concerts and sporting events, then subsequently made millions of dollars reselling the tickets to fans at higher prices." *Id.*

60.    In a concurring statement issued along with the FTC's 2021 Press Release and Consent Orders, Defendant Rebecca K. Slaughter, then the FTC's Acting Chairwoman, who had participated in drafting the BOTS Act, explained that "[t]he Act's bipartisan sponsors sought to crack down on the abuses that unscrupulous actors inflict on consumers *whose typing fingers were no match for algorithms in attempting to secure tickets online*." Rebecca K. Slaughter, *Concurring Statement of Acting Chairwoman Rebecca Kelly Slaughter*, 2021 WL 268279 at *1 (2021) (emphasis added).

61.    Since those three initial BOTS Act cases in 2021, the FTC has not enforced the BOTS Act at all. Neither through litigation nor through settlement.

**The FTC's Investigation of Key Investment Group**

62.    In or around December, 2023, the FTC served a Civil Investigative Demand ("CID") on Key Investment Group. The CID's stated purpose was to investigate whether Key Investment Group violated the BOTS Act, specifically in relation to Ticketmaster.

63.    Key Investment Group fully complied with the CID.

64.    KIG's compliance included (a) an extensive document review, culminating in the production of thousands of documents, and (b) four comprehensive investigational hearings deposing members of Key Investment Group's leadership team.

65.    Key Investment Group's full compliance with the CID's extensive requests and subsequent negotiations with the FTC has cost the company nearly $2,000,000 in legal fees.

66.    Following the provision of the FTC with fulsome discovery and testimony, counsel for Key Investment Group drafted a comprehensive White Paper (the "White Paper").

67.    Among other things, the White Paper:

(a)     Provided a detailed analysis of Key Investment Group's business and compliance practices,

(b)     Explained why Key Investment Group does not circumvent Ticketmaster's security measures, access control systems, or other technological control or measures,

(c)     Confirmed that Ticketmaster did not "enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules" (15 U.S.C. § 45c(a)(1)(A)) as related to KIG,

(d)     Demonstrated that Key Investment Group does not exceed posted ticket limits, and

(e)     Showed that Plaintiffs could not possibly have had the requisite knowledge that its behavior violated the BOTS Act for civil penalties to accrue.

68.     Along with the White Paper, Key Investment Group provided the FTC an economic analysis conducted by third-party Cornerstone Research (the "Cornerstone Research Analysis"). The Cornerstone Research Analysis confirmed that Key Investment Group complied with posted ticket limits in at least approximately 98% of cases.

**The FTC's Draft Complaint**

69.     On March 31, 2025, President Trump issued an Executive Order, titled "Combating Unfair Practices in the Live Entertainment Market." *See* Exec. Order No. 14254, 90 Fed. Reg. 14699, 2025 WL 986449 (2025).

70.     The Executive Order, *inter alia*, directed "the FTC [to] rigorously enforce the Better Online Tickets Sales Act, 15 U.S.C. 45c[.]" *Id.*

71.     The Executive Order was accompanied by a Fact Sheet. *See Fact Sheet: President Donald J. Trump Will End Price – Gouging by Middlemen in the Entertainment Industry,* The

White House (Mar. 31, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-will-end-price-gouging-by-middlemen-in-the-entertainment-industry/.

72.     The Fact Sheet explained, in pertinent part, that "***the BOTS Act [is] meant to stop scalpers from using bots to purchase tickets[.]***" *Id.* (emphasis added).

73.     Minutes following the issuance of the President's Executive Order and accompanying Fact Sheet, Defendants sent Plaintiffs a one-count Draft Complaint, alleging that Key Investment Group and the Individual Plaintiffs violated the BOTS Act.

74.     Defendants told Plaintiffs they would file the Draft Complaint unless, among other things, Plaintiffs admitted that they violated the BOTS Act (even though Plaintiffs did not).

75.     Plaintiffs attempted to negotiate a resolution with Defendants, but Defendants maintained they would not negotiate a resolution unless and until Plaintiffs admitted that their business practices—which are customary and nearly, if not entirely, uniform in the legitimate secondary-ticket market industry—violate the BOTS Act.

76.     Because Plaintiffs have not violated and do not violate the BOTS Act, they could not agree to Defendants' terms.

**Key Investment Group's Industry-Standard Business Practices**

77.     Key Investment Group employees, many of whom reside in and around Baltimore, purchase tickets from Ticketmaster, a primary ticket issuer.

78.     Key Investment Group employees use the Insomniac browser, often with many tabs open. Key Investment Group employees often utilize multiple accounts on a single computer, with each tab open to its own individual account.

79.     Insomniac has a "remote access" feature that allows Key Investment Group management to supervise ticket purchases. Key Investment Group uses this feature to monitor its

13

employees. Insomniac also has a feature that allows each opened tab its own IP address. Key Investment Group sometimes employs this feature as well.

80.    Ticket resellers throughout the industry routinely use the Insomniac browser for these purposes. Ticketmaster is well aware of this fact.

81.    Often, Key Investment Group accounts will be under pseudonyms. This is common practice in the secondary ticket industry.

82.    KIG does not use multiple accounts or pseudonyms to circumvent any of Ticketmaster's security measures, access control systems, or other technological controls.

83.    Using multiple accounts with distinct, readily-identifiable pseudonyms serves Key Investment Group's legitimate business needs. This is why Key Investment Group and many; if not all, legitimate secondary-ticket brokers use pseudonyms.

84.    Distributing tickets across multiple accounts, rather than storing a significant quantity of tickets on a single account, reduces exposure if an account is compromised (through, for example, hacking by bad actors).

85.    Usage of distinct, readily-identifiable pseudonyms enables KIG to track purchases and refunds to more easily service its customers.

86.    Ticketmaster is and has been at all times aware of Key Investment Group's use of multiple accounts, some of which use pseudonyms. Ticketmaster has both expressly and impliedly authorized KIG's use of same.

87.    Ticketmaster works actively with Key Investment Group to resell tickets KIG purchased using accounts with pseudonyms on Ticketmaster's platform. Again, this is a common industry practice, which numerous if not all legitimate ticket resellers employ.

14

88.     In addition to ticket resellers on the secondary market, many companies employ the practice of using multiple accounts, sometimes under pseudonyms, in order to obtain tickets for clients and/or employees. Many lay consumers also employ the practice of using multiple accounts, sometimes under pseudonyms, in order to obtain tickets.

## SIM Cards and SIM Boxes

89.     A SIM card is a physical, removeable smartcard that stores and receives information.

90.     Every modern cellular phone contains a unique SIM card.

91.     Most cellular phones allow users to remove and/or replace physical SIM cards.

92.     Ticketmaster does not prohibit using SIM cards that have been removed from a cellular telephone.

93.     Ticketmaster requires each Ticketmaster account to be linked to a unique SIM card.

94.     When a Key Investment Group employee signs into Ticketmaster using a Ticketmaster account, a unique two-factor authentication code is sent to the SIM card associated with that account.

95.     If the SIM card is located in the Key Investment Group employee's cellular phone, the unique two-factor authentication code will populate on the employee's cellular phone as a text message.

96.     If the SIM card is not in a cellular phone, the unique two-factor authentication code can be sent to another device.

97.     For example, if the SIM card is connected to a Google Spreadsheet, the unique two-factor authentication code can populate into the spreadsheet.

98.     A SIM Box is a device that can hold multiple SIM cards.

99.     If multiple SIM cards are in a SIM Box, each unique two-factor authentication code will be sent to the SIM Box. The SIM Box can then provide the unique code(s) to the consumer via other means. For example, if the SIM Box is connected to a Google Spreadsheet, the unique codes can populate into the spreadsheet.

100.    A SIM Box is hardware. In essence, a SIM Box is nothing more than a repository for SIM cards. It cannot execute scripts. It is not a bot.

101.    Once the Key Investment Group employee receives a unique two-factor authentication code from Ticketmaster for an individual account, the employee must manually input the unique code into Ticketmaster's website in order to be taken to Ticketmaster's virtual waiting room.

102.    At no time does the Key Investment Group employee run a script or use a bot to enter Ticketmaster's virtual waiting room.

103.    This process parallels that of any other consumer who logs into their Ticketmaster account and receives a two-factor authentication code via their unique SIM card. The consumer must manually input the unique two-factor authentication code into Ticketmaster's website to be taken to Ticketmaster's virtual waiting room.

104.    A consumer's use of a unique two-factor authentication code received on the consumer's SIM card, which the consumer then inputs into Ticketmaster's website in order to be taken to Ticketmaster's virtual waiting room, does not constitute circumvention of a security measure, access control system, or other technological control or measure.

105.    A Key Investment Group employee's use of a unique two-factor authentication code received on a Key Investment Group SIM card, which the Key Investment Group employee then inputs into Ticketmaster's website in order to be taken to Ticketmaster's virtual waiting room,

does not constitute circumvention of a security measure, access control system, or other technological control or measure.

**Key Investment Group Employees Wait on Queues in Virtual Waiting Rooms**

106.    After a Key Investment Group employee logs into Ticketmaster using a KIG account, the KIG account is placed in the queue of a virtual waiting room.

107.    Key Investment Group has no discretion or control over where in the queue Ticketmaster places each KIG account. Ticketmaster has total control over where in the queue each account (including each KIG account) is placed. This control is not based on timing. So, for example, if a Key Investment Group account enters the virtual waiting room at 10:03, the account can end up behind another account that entered the virtual waiting room at 10:04.

108.    Because Key Investment Group does not use bots, Key Investment Group's accounts have no ability to get to the head of the queue and bypass the virtual waiting room.

109.    Instead, Key Investment Group's employees must wait, often for hours, to move from whatever position Ticketmaster placed the account they are using in the queue to the front of the queue. This is the same process for ordinary consumers and for other legitimate industry-standard ticket resellers who do not use bots.

110.    When a Key Investment Group reaches the front of the queue, the account is redirected to Ticketmaster's ticket purchasing page.

111.    By the time the Key Investment Group account enters the ticket purchasing page, there may be many tickets left to purchase; there may be few; there may be none.

112.    If there are tickets remaining, and if Key Investment Group determines that the remaining ticket(s) would potentially be able to be resold, the Key Investment Group employee will purchase one or more tickets using that account.

113.    Crucially, ***the Key Investment Group Employee will not (and cannot) purchase more tickets per account than Ticketmaster allows***.

114.    After purchasing tickets, Key Investment Group will attempt to resell the tickets on the secondary market. Sometimes it will make money doing so. Sometimes it will lose money doing so. Again, this is the exact same process used by legitimate secondary-ticket resellers (who do not use bots) throughout the industry.

115.    Ticketmaster is aware that Key Investment Group uses multiple accounts.

116.    Ticketmaster is aware that many of Key Investment Group's accounts use pseudonyms.

117.    Ticketmaster has both explicitly and implicitly approved Key Investment Group's use of such multiple accounts.

118.    Ticketmaster's ticket resale program actively works with Key Investment Group.

119.     One way in which it does so is by providing Key Investment Group with tools to manage its multiple accounts and more easily resell tickets on Ticketmaster. Ticketmaster syncs all Key Investment Group accounts and pays Key Investment Group a single check for all tickets resold on all Key Investment Group accounts each week, including those accounts using pseudonyms.

120.    Ticketmaster provides many other legitimate ticket resellers (who do not use bots) with these same tools and works with other legitimate ticket resellers employing these same methods.

121.    Ticketmaster has an incentive to work directly with Key Investment Group to manage Key Investment Group's multiple accounts, because Ticketmaster earns commissions from Key Investment Group for each ticket that is resold on Ticketmaster.

122.    Ticketmaster has the same incentive to work directly with other legitimate ticket resellers to manage their multiple accounts, which is why Ticketmaster does so.

123.    Because Ticketmaster actively works with Key Investment Group and other legitimate secondary-ticket resellers, Ticketmaster has no incentive to, and in fact does not, "enforce posted event ticket purchasing limits or [] maintain the integrity of posted online ticket purchasing order rules" with regard to Key Investment Group and those other legitimate secondary-ticket resellers. 15 U.S.C. § 45c(a)(1)(A).

124.    To the contrary, Ticketmaster works directly with Key Investment Group and other legitimate ticket resellers to assist them in syncing their multiple accounts to purchase and then resell tickets on Ticketmaster's platform.

125.    Ticketmaster ***does*** attempt to "enforce posted event ticket purchasing limits [and] maintain the integrity of posted online ticket purchasing order rules" with respect to non-legitimate bots users. *Id.*

126.    Unlike legitimate members of the secondary-ticket market, Ticketmaster has no control over illegitimate bots users. Ticketmaster attempts to block those bots users from skipping the queue and from purchasing excess tickets.

127.    In attempting to "enforce posted event ticket purchasing limits [and] maintain the integrity of posted online ticket purchasing order rules" with respect to non-legitimate bots users, Ticketmaster is doing exactly what the BOTS Act contemplated and what the statutory text allows.

**Plaintiffs Had No Knowledge That Their Actions Could Violate the BOTS Act**

128.    Key Investment Group and the Individual Plaintiffs designed their business to ensure it would not violate the BOTS Act.

129.     The legislative history of the BOTS Act confirmed to Key Investment Group and the Individual Plaintiffs that the BOTS Act was meant to apply to and did, in fact, only apply to bot users.

130.     The historical and contextual background of the BOTS Act confirmed to Plaintiffs that the BOTS Act was meant to apply to and did, in fact, only apply to bot users.

131.     Contemporaneous news coverage that came out around the time of the passage of the BOTS Act uniformly understood the BOTS Act to be about preventing the use of bots, confirming to Plaintiffs that the BOTS Act was meant to apply to and did, in fact, only apply to bot users.

132.     The FTC's only prior BOTS Act Consent Orders, all targeting recidivist bots users, confirmed to Key Investment Group and the Individual Plaintiffs that the BOTS Act was meant to apply to and did, in fact, only apply to bot users.

**FIRST CAUSE OF ACTION:**
**DECLARATORY JUDGMENT**
**PLAINTIFFS DO NOT VIOLATE THE BOTS ACT**

133.     Paragraphs 1 through 132 are incorporated herein by reference.

134.     A violation of the BOTS Act requires the use of bots.

135.     Plaintiffs do not use bots.

136.     A violation of the BOTS Act requires a party "***to circumvent a security measure, access control system, or other technological control or measure*** on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules." 15 U.S.C. § 45c(a)(1)(A) (emphasis added).

137.    Plaintiffs do not violate the BOTS Act because Plaintiffs do not "circumvent a security measure, access control systems, or other technological control or measures that is used by [Ticketmaster] to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules." *Id.*

138.    A violation of the BOTS Act requires a "ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules." *Id.*

139.    Even if Plaintiffs would have circumvented Ticketmaster's security measures, access control systems, or other technological controls (to be clear, they do not), a BOTS Act violation would still not accrue because Ticketmaster does not "enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules" with respect to Plaintiffs. *Id.*

140.    To the contrary, Ticketmaster has actual knowledge of Plaintiffs' behavior, consents to Plaintiffs' behavior, and actively encourages Plaintiffs' behavior.

141.    For any or all of these reasons, the Court should issue a Declaratory Judgment declaring that Plaintiffs do not violate the BOTS Act.

**SECOND CAUSE OF ACTION:**
**INJUNCTIVE RELIEF**
**DEFENDANTS CANNOT ENFORCE THE BOTS ACT AGAINST PLAINTIFFS**

142.    Paragraphs 1 through 141 are incorporated herein by reference.

143.    Plaintiffs did not violate the BOTS Act.

144.    As such, the Court should enjoin Defendants from enforcing or attempting to enforce the BOTS Act against Plaintiffs.

### THIRD CAUSE OF ACTION:
### DECLARATORY JUDGMENT
### PLAINTIFFS HAD NO REQUISITE KNOWLEDGE TO ASSESS CIVIL PENALTIES

145.    Paragraphs 1 through 144 are incorporated herein by reference.

146.    Pursuant to 15 U.S.C. § 45(m)(1)(A) of the FTC Act, civil penalties for a BOTS Act violation can only accrue if a party had "actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule."

147.    Plaintiffs did not and do not have actual knowledge or knowledge fairly implied on the basis of objective circumstances that they have violated, are violating, or will violate the BOTS Act.

148.    Given the historical background of the BOTS Act, its legislative history, and its consistent interpretation, understanding, and enforcement both inside and outside of the FTC, it is virtually impossible for Plaintiffs to have had knowledge that their actions violated the BOTS Act.

149.    The Court should declare that Plaintiffs did not violate the BOTS Act. But, even should the Court somehow determine that Plaintiffs' industry-standard behavior constituted a BOTS Act violation, the Court should definitively conclude and declare that, because Plaintiffs did not have the requisite knowledge required for civil penalties to accrue, civil penalties cannot be assessed.

### FOURTH CAUSE OF ACTION:
### INJUNCTIVE RELIEF
### DEFENDANTS CANNOT ASSESS CIVIL PENALTIES FROM PLAINTIFFS

150.    Paragraphs 1 through 149 are incorporated herein by reference.

151.    As described above, Plaintiffs did not have the requisite knowledge to allow the FTC to assess Civil Penalties for any supposed BOTS Act violation.

152.    As such, the Court should enjoin Defendants from assessing or attempting to assess Civil Penalties from Plaintiffs.

**FIFTH CAUSE OF ACTION:**
**FIFTH AND FOURTEENTH AMENDMENTS OF THE CONSTITUTION**
**THE BOTS ACT IS VOID FOR VAGUENESS AS APPLIED TO PLAINTIFFS**

153.    Paragraphs 1 through 152 are incorporated herein by reference.

154.    "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

155.    The BOTS Act is not vague when it comes to bots users. As to bots users, the BOTS Act clearly applies.

156.    However, Defendants' insistence that the BOTS Act applies to Plaintiffs implicates both of the two reasons for this Court to void the statute as impermissibly vague as applied to them.

157.    At the time the BOTS Act was enacted, people of ordinary intelligence (*i.e.*, the Act's drafters, its supporters in and outside of Congress, the populace at large) believed that the BOTS Act was meant to stop the behavior of people who use bots to "circumvent a security measure, access control system, or other technological control or measure[.]" 15 U.S.C. § 45c(a)(1)(A).

158.    People of ordinary intelligence still believe this.

159.    Defendants have not provided Plaintiffs a ***reasonable*** opportunity to understand what conduct Defendants believe the BOTS Act prohibits.

160.    Instead, Defendants have thrust their novel interpretation of the BOTS Act on Plaintiffs, threatening Plaintiffs with severe financial and injunctive harm—including complete closure of their business—if Plaintiffs do not succumb to Defendants' provisioning the BOTS Act with a newfound meaning.

161.    As such, the BOTS Act is unconstitutionally vague as applied to Plaintiffs.

162.    The statute is *also* void for vagueness as applied to Plaintiffs for the second reason provided by the *Hill* Court. Namely, Defendants use of the statute to target Plaintiffs "authorizes or even encourages arbitrary and discriminatory enforcement." 530 U.S. at 732.

163.    Defendants may disagree with the practices of Plaintiffs and other legitimate members of the secondary-ticket market industry. But that does not make those practices illegal.

164.    Repurposing the BOTS Act to target Plaintiffs, when there is every indication that the BOTS Act only applies to users of malicious computer code, constitutes "arbitrary and discriminatory enforcement." *Id.*

165.    For this reason as well, the Court should find the BOTS Act unconstitutionally void as to vagueness as applied to Plaintiffs.

### PRAYER FOR RELIEF

Wherefore, Plaintiffs pray that the Court:

(a)    Declare that Plaintiffs did not and do not violate the BOTS Act,

(b)    Enjoin Defendants from enforcing the BOTS Act against Plaintiffs,

(c)    Declare Defendants' attempt to assess Civil Penalties against Plaintiffs unlawful,

(d)    Enjoin Defendants from assessing Civil Penalties against Plaintiffs,

(e)    Find the BOTS Act unconstitutional as applied to Plaintiffs,

(f)    Award Plaintiffs fees, costs, disbursements and reasonable attorneys' fees,

(g)     Grant Plaintiffs any other and further relief as the Court may find just and proper.


Dated: July 21, 2025                Respectfully submitted,

                                    */s/ Bezalel A. Stern*
                                    Bezalel A. Stern
                                    Joshua N. Drian (*pro hac vice* to be filed)
                                    MANATT, PHELPS & PHILLIPS, LLP
                                    1050 Connecticut Ave. NW, Suite 600
                                    Washington, D.C. 20036
                                    Tel.: (202) 585-6500
                                    bstern@manatt.com
                                    jdrian@manatt.com

                                    *Counsel for Plaintiffs*